## Augusta Bank *versus* The City of Augusta.

The Act, (c. 379, special laws of 1850,) authorizing certain cities and towns to grant aid in the construction and completion of the Kennebec and Portland Railroad, is constitutional.

It was the duty of the treasurer of the respective cities and towns to determine whether his town or city had duly accepted the Act, and whether all the preliminaries requisite to give validity to the scrip had been complied with, before he issued it; and his determination is conclusive.

These questions cannot be raised on the trial of an action brought upon the scrip.

A *coupon* not payable to order or bearer, nor containing other equivalent words, is not negotiable.

A *coupon*, to be negotiable, must be so upon its face, without reference to any other paper.

A *coupon*, not negotiable on its face, will not be held to be so, upon proof that similar *coupons* have been passed from hand to hand as if negotiable.

Augusta Bank *v.* Augusta.

The Act of 1856, (c. 24, §§ 1, 2,) authorizing the *bona fide* holder of *coupons* to maintain an action thereon in his own name, does not impair the obligation of the contracts in bonds already issued, but relates wholly to the remedy, and is constitutional.

This Act is not limited in its operation to bonds under seal, but applies to the scrip issued under the Act of 1850 authorizing certain cities and towns to grant aid in the construction and completion of the Kennebec and Portland Railroad.

This Act was continued in force, by the second section of the repealing Act in the Revised Statutes of 1857, as to coupons then in possession of any person for a valuable consideration.

ON REPORT.

ASSUMPSIT in which the plaintiffs claim to recover the amount of certain coupons specified in the writ, which were attached to sundry certificates of debt, purporting to have been issued by the defendants, in aid of the Kennebec and Portland Railroad Company, under the Act of August 17, 1850.

Plea, the general issue, with a brief statement alleging payment. The defendants also filed specifications of defence, upon which, however, no question arose.

The plaintiffs introduced the proceedings of the defendants in petitioning the Legislature for authority to aid in the construction of the railroad; the Act of August 17, 1850; the records of the railroad company, showing their acceptance of the Act; and evidence tending to show that the Act had been duly accepted by the defendants; that all the requirements of the Act had been complied with; that the scrip was issued by the treasurer of the defendants; that the coupons in suit were genuine; that they were taken by the plaintiffs from various holders of the scrip for a valuable consideration, after they became due, at the request of Reuel Williams, who had since paid the plaintiffs the amount of them; that this suit was ordered by a vote of the directors of plaintiffs; and that coupons similar in form to those in suit had, for several years, in different parts of the State, passed from hand to hand as if negotiable. A copy of the scrip and of a coupon are given in the opinion.

After the plaintiffs' evidence was introduced, a nonsuit was entered by consent, with the agreement that the evidence should be reported to the law Court, and, if upon so much of the evidence as was legally admissible the action could be maintained, it should stand for trial, otherwise judgment should be rendered for the defendants on the nonsuit.

*Williams* and *Cutler*, (with whom was *P. Barnes*,) for plaintiffs.

I. The Act of August 17, 1850, is constitutional.   15 Conn., 471; 21 Penn., 147, and cases there cited; 18 New York R., 38; 9 Humph., 252; 1 Ohio State R., 77; 7 Am. Law Reg., 92, 747; 8 Am. Law Reg., 286; 2 Railway Cases, 63; Redfield on Railways, 533; 31 Maine, 285.

II. The issue of the scrip was valid, and the proceedings under the Act were regular.

Of the performance of these conditions the treasurer of the city was made the judge, and his decision was conclusive.   *Knox Co. Com.* v. *Aspinwall & al.*, 21 Howard 545.

III. This action is maintainable, under § 34, c. 51 of the R. S.

1. The term "bonds" includes scrip.   This is established by reference to the Act of 1856, from which this provision is taken.

2. This scrip is in legal effect "issued by a railroad corporation."

3. The term "*such* bonds," in § 34, refers to all bonds issued in aid of a railroad company.   The action is given not against the corporation technically "issuing" them, but against the corporation *engaging to pay them.*

IV. If this action is not within the terms of the R. S., it is maintainable under the Act of 1856, and the saving clause of the R. S.

This Act has not been repealed so far "as any rights and their remedies existed by virtue" of its provisions.   The plaintiffs held these coupons, January 1, 1858, and then

could have maintained this action upon them.   That remedy is preserved by the saving clause referred to.

V. The coupons in suit, rightfully interpreted, contain a promise to pay the stipulated sum to the bearer.   Their construction depends upon the circumstances under which they are issued and received.

As in case of a guaranty, not addressed to any particular person; or a promise to accept bills; or offer of rewards, &c.

VI. The evidence of usage was admissible to show that the parties contracted with reference to it.   3 Maine, 276; 18 Maine, 351; 38 Maine, 414; 9 Wheaton, 582; 21 Howard, 539, 576.

*Joseph Baker,* (with whom was *H. W. Paine,*) for the defendants.

I. The loan Act never became a law binding on the city of Augusta.

1. The Legislature itself did not pass the Act, but delegated legislative power to the directors of the railroad, and to the cities and towns, and therefore all the proceedings are void.   Loan Act, § 2; Const., art. 4, p. 1, § 1; *Barto* v. *Himrod,* 4 Selden, (N. Y.,) 483; *Bank of Rome* v. *City of Rome,* 18 N. Y., and 4 Smith, 38.

2. Because the purposes of the Act are so entirely inconsistent with the purposes for which the defendants were incorporated, that the acceptance by a majority, even in a legal form, would not bind the minority or the corporation.   R. S., c. 3, § 26; City Charter, § 2; *Hooper* v. *Emery & al.,* 14 Maine, 375, and cases; *Bussy* v. *Gilmore,* 3 Maine, 191; *Norton* v. *Mansfield,* 16 Mass., 48; *Parsons* v. *Goshen,* 11 Pick., 396; *Anthony* v. *Adams,* 1 Met., 284 – 6.

3. But the Legislature did not undertake to make this Act effectual itself, but only to provide the mode or process by which it might take effect.   Loan Act, §§ 1, 2, 21.   Granting, for the sake of the argument, that it was competent for the Legislature to do so, we hold that that process must

be strictly and punctiliously pursued, or the Act has not the force of law.

II. The scrip was not legally issued. In considering this proposition, we must bear in mind that the defendants, as a corporation, are sued here for the acts of their agent, the treasurer, a public officer, and not for their own acts in their corporate capacity; and must keep before us the familiar principle of law applicable to such agencies, that if the limitations of the agent's authority are public in their nature, or are made known to the party dealing with him, the principal will not be bound if those limitations are exceeded or violated. *Bryant* v. *Moore,* 26 Maine, 84.

In this case, all the authority of the treasurer was derived from the public loan act, the public city charter, and the public records of the city, and were open to the knowledge and inspection of all parties, and the plaintiffs were bound to know, and legally and conclusively presumed to know, the extent and limitation of his authority.

The agent did not comply with the statute and vote of the city in various particulars.

III. Estoppel.

1. We are not estopped to deny the validity of the meeting for the acceptance of the Act, because this is a part of the process provided by the Act itself, by which it was to become a law.

2. We are not estopped to deny the legality of the issue of scrip, because the treasurer only undertook to act as agent, with known limitations of authority, one of which was taking the securities required by the Act, as a condition precedent to the issue of scrip. He was not in the ordinary exercise of his official functions, but exercising a most extraordinary power, to create a city debt of $200,000, and bearing on the very face of the scrip a reference to the law which declares the extraordinary purpose. "*Ignorantia legis neminem excusat.*" Every person dealing with him under such circumstances is put on his inquiry and bound to know the extent and qualifications of his authority.

3. But the plaintiffs are not in a position to claim an estoppel on the defendants.

*a.* Because they were not induced to part with their money on the strength and credit of the conduct of defendants. Before they paid out one dollar, they had the ample written security of Mr. Williams, legal and available. They acted as his agent.

*b.* If they did not take them exclusively on the credit of Mr. Williams, they did take and hold them as collateral security for his agreement; and such holders are never deemed innocent holders for a valuable consideration, so as to be entitled to set up an estoppel or shut out a defence. *Holmes* v. *Smith*, 16 Maine, 177–180; *Lee* v. *Kimball*, 45 Maine, 172–175.

*c.* They are not such holders, because they took the coupons when overdue and dishonored.

IV. The coupons are not negotiable.

1. Because they are an incident, a mere cast of interest, and a part and parcel of the scrip, and no contract in and of themselves. The scrip contains a promise to pay the interest according to the coupons, and the repetition of the promise in the coupons is mere surplusage, and may be rejected.

2. But certainly they are not payable to the plaintiffs. They were not issued to them, and are not negotiable, as they contain no apt words of negotiability. Story on Bills, 19, 20, 220, 221; do. on Notes, 13; Byles on Bills, 60, 61, 130; *Myers* v. *Y. & C. R. R. Co.*, 43 Maine, 232; *Jackson* v. *same*, 48 Maine, 147.

3. But, it is said, if not negotiable on their face, *custom* has made them so by the proof offered. This we deny.

The plaintiffs did not offer to prove the law merchant, but the custom in certain localities. Such custom is only the incipient stages of a process which may, in the course of time, ripen into the law merchant.

4. The coupons are not made negotiable by the Act of 1856.

*a.* The Legislature has no power to make an unnegotia-

ble contract negotiable, as it would be impairing the obligation of the contract.

*b.* But if that statute could confer any rights, its repeal could take them away. They were created by the statute, existed by it, and, when it was repealed, they died. It was left out of the revision, 1857, long before this action was commenced, and repealed by the repealing Act, R. S., c. 51, §§ 33, 34; Repealing Act, § 1; 36 Maine, 361; *Bank* v. *Freeze*, 18 Maine, 109–112; *Coffin* v. *Rich*, 45 Maine, 507–511; *People* v. *Livingston*, 6 Wend., 526.

Nor was any right saved to plaintiffs by the saving clause of the repealing Act, § 2. That clause saves "rights and *their* remedies." If the statute of 1856 attempted to create or confer any "*rights*," it is void, as impairing the obligation of contracts. If it only attempted to confer a remedy, the repeal of the law would defeat it, and the saving clause preserves no "remedy" except those attached to some preserved "right."

*c.* That statute does not apply to these coupons, because it is expressly limited to coupons originally attached to "*bonds*," and these were not. The word "bond" has a well defined, technical meaning, and, according to Rule 1, R. S. 1841, c. 1, § 3, that meaning must be applied here, and that excludes these coupons.

Other questions were discussed by the counsel, but they do not become material in the view of the case taken by the Court.

The opinion of the Court was drawn up by

TENNEY, C. J. — This suit is for the recovery of an amount of coupons originally attached to city scrip, for payment of interest thereon, but cut from the same, and passed by the holders of the scrip to other parties, the scrip with the coupons purporting to have been issued by the city of Augusta, as a loan of its security, under an Act of the Legislature, authorizing certain cities and towns to grant aid in the con-

struction and completion of the Kennebec and Portland Railroad. Special laws of 1850, c. 379.

A portion of the coupons in suit, upon their face, were payable on November 1, 1854, and a portion on May 1, 1855, and the plaintiffs soon after became possessed thereof, having received them from many individuals for a full and valuable consideration, by the written request to their cashier, of Reuel Williams, who afterwards paid to them the amount thereof, as the evidence in the case tended to show. Whether they were taken by the plaintiffs as continuing evidence of the liability of the city as they were before they were so taken, or whether the payment thus procured by Mr. Williams, and made by the plaintiffs, was for the purpose of cancelling the instruments, was a question of fact in the case, which must be settled as such by a jury, in another trial.

After the evidence of the plaintiffs had been adduced, a nonsuit was entered, and the case reported to the law Court, in order that certain legal questions should be settled.

The first question presented to the whole Court is, whether the Legislature had the constitutional power to pass the Act. No reason has been offered in the argument of the counsel for the city, sufficient to lead us to doubt the existence of this power in the Legislature. Upon its acceptance by the city of Augusta, and by the Kennebec and Portland Railroad Company, it was to be treated as binding upon both parties, so far as to make their subsequent acts, touching the scrip, &c., if according to its provisions, effectual.

It is denied on the part of the city, that it ever accepted the Act, and that the scrip was ever issued, so that it is under any obligation to make payment thereof, or of the coupons severally attached to each piece of the same. Who is to determine the question, whether the city accepted the Act? And how is it to be settled, whether the scrip and the coupons are legally binding upon the corporation whose treasurer has issued them? In section 2, it is enacted, upon the acceptance of the Act as aforesaid, by any or all of the

aforesaid cities or towns, the treasurer of each city or town, which shall have accepted the Act, is hereby authorized to make and issue from time to time, for the purposes contemplated in this Act, the scrip of such city or town for the amount granted by such city or town respectively, in convenient and suitable sums, payable to the holder thereof on a term of time, not less than twenty, nor more than thirty years, with coupons for interest, attached, payable annually or semi-annually, and to deliver the same to the directors of said railroad company from time to time, as may be required, subject to the several provisions of this Act. In all cases, the scrip shall bear date at the delivery thereof, and the proceeds of the same shall be applied by the directors of the company exclusively to the construction and completion of the Kennebec and Portland Railroad, and to the payment of the debts incurred for that object."

In the above provision, an important trust is lodged with the several treasurers of the cities and towns upon the acceptance of the Act. Until this acceptance, he has no power to issue the scrip. Upon its acceptance, and the compliance with the statute in every respect required for the purpose, the treasurer has the most ample power to issue the scrip and deliver the same to the directors of the railroad, to be by them applied in furtherance of the great object named in the title of the Act. The Act provides in no express terms for any tribunal which shall adjudge whether these various steps have been taken. It could not have been intended by the Legislature, that this scrip should be issued, delivered to the directors of the railroad, who should receive the amount of the same, and expend it in the construction and completion of the railroad, and the question be open to be presented on the trial of any action brought upon any piece of scrip, whether the Act was duly accepted, and the scrip had been issued, and sent into the world for a full consideration, after a compliance with every requirement of that Act.

The duty of deciding these questions was imposed upon

the treasurer of each city and town. He could not issue the scrip till the Act was accepted; he could not deliver the scrip to the directors till every necessary step had been taken to render the delivery proper. It was his province to see that every legal requirement was fulfilled as a condition of carrying out the great object of the Act. It was, under the Act, a matter of absolute necessity that he should be the judge in these matters, or he could not act at all in the premises.

This power of the treasurer is inferrable from decisions of cases which are analagous to the one before us. In the case of *Spofford* v. *Hobbs*, 29 Maine, 148, where a power of attorney authorized the attorney to sell certain lands, "for the purpose of making actual settlement thereon," and to sign, and to seal, and deliver "legal and sufficient deeds, with the several covenants and a general warranty," to convey such lands, "in fee simple," *it was held*, that the attorney was clothed with discretion to judge whether the purchaser intended to purchase for purposes of settlement, and, there being no evidence of fraud on the part of the purchaser, or of the attorney, a conveyance made under the power was valid, although it appeared afterwards that the land was not purchased for actual settlement, but on speculation.

The case of *Commissioners of Knox County* v. *Aspinwall & al.*, 21 Howard's U. S. Rep., 539, cited for the plaintiffs, is in point and decisive of the case, upon this question, which is fully sustained by the principle and the authorities cited, and numerous others in favor of the plaintiffs.

The action is sought to be maintained on three distinct grounds;—first, that the coupons are of themselves, or taken in connection with the scrip, negotiable paper; second, that they had become so by custom in the mercantile community; and third, by virtue of the Acts of 1856, c. 248, § 1, and R. S., c. 51, §§ 33 and 34.

The following is a copy of one piece of the scrip, which varies from others in number and amount only.

Augusta Bank *v.* Augusta.

"No. 149.        United States of America.        *A.*
"$1000.              State of Maine.            $1000.
                "City of Augusta.
                      "Loan.

"Be it known, that the city of Augusta will pay in Boston, to the holder of this bond, the sum of one thousand dollars, in twenty years from the date hereof, and will also pay at the same place, the semi-annual coupons hereto annexed, as the same shall severally become due, value received.

"In testimony whereof, I, the Treasurer, in the name and in behalf of said city, in conformity with the Act of the Legislature of the State of Maine, passed August 17th, A. D., eighteen hundred and fifty, vesting in me authority for this purpose, have hereunto set my hand.

"Dated at said Augusta, this first day of November, A. D., 1850.              "John A. Pettengill, *Treasurer.*"

Countersigned:—          "Alfred Redington, *Mayor.*

  "Attest:—          Daniel C. Stanwood, *Clerk.*"

The form of the coupons, varying in number and amount, as in the scrip, is as follows:—

                "City of Augusta.

"Bond No. 149.                    Coupon No. 40.

"The city of Augusta will pay thirty dollars on this coupon, the first of Nov. 1870, in Boston.

  "$30.              John A. Pettengill, *Treasurer.*"

1. It is essential to the negotiability of a bill of exchange or promissory note, between all persons, excepting the king or government, that it should be payable to order or to bearer, or that some other equivalent words should be used, authorizing the payee to assign or transfer the same to third persons.   Story on Bills of Exchange, § 60.

It is said, in Chitty on Bills, 181, the modes of making a bill transferrable, are by drawing it either payable to A B, or order, or to A B, or bearer, or to the drawer's own order, or to bearer generally.   But any terms, expressing the intent, will render the bill negotiable.   Ibid., 218–220.

A promissory note is a promise or engagement in writing to pay a specified sum, &c., to a person therein named, or order, or to the bearer. These notes were attempted to be introduced by goldsmiths several years before the statute of 3 and 4 of Anne, c. 9, and were generally esteemed by merchants as negotiable, but Lord HOLT as strenuously opposed their negotiability, as he did that of common promissory notes; and they were not generally settled to be negotiable till the statute of Anne, just referred to, was passed, which relates to them as well as to common promissory notes. Ibid., 554. This statute places promissory notes on the same footing as bills of exchange, and consequently the decisions and rules relating to one are, in general, applicable to the other. Ibid. 552.

There are other prerequisites essential to the character of negotiability of bills of exchange and promissory notes, some of which may be more fully adverted to hereafter; one of which is, that the payment must be free from any contingency, and payable in money.

It cannot be contended, in behalf of the plaintiffs, that the coupons, referred to in the declaration of the writ, are embraced within the principles which have been treated as well settled, as they appear when detached from the scrip. But it is insisted for the plaintiffs, in a very able and ingenious argument, that the coupons in this case have that upon their face, which shows an intimate relation between them and the pieces of scrip from which they were severally detached; and, by an examination of the principal obligation, it will be seen at once that the latter is negotiable paper, having the characteristics of a promissory note payable to the holder, and that the coupon is for the interest incident to the scrip.

In looking at the history of negotiable paper, the object of it cannot be mistaken. It is true that a bill of exchange, or a promissory note, is a chose in action, yet it may be assigned so as to vest the legal as well as the equitable interest therein in the indorsee or assignee, and to entitle him to in-

stitute a suit thereon, in his own name. Though such paper is merely a simple contract, yet a sufficient consideration is implied from the nature of the instrument, and its existence in fact is rarely necessary to be proved, and, in the hands of a *bona fide* holder, is indisputable.

The privileges thus secured by such paper to the holder, who took it in the regular course of business, are important. In a bill of exchange, a release by the drawer to the acceptor, or a set-off, or a cross demand, due from the former to the latter, cannot affect the right of action by the payee or indorsee; because the legal and not the equitable interest is vested in such payee or indorsee, and the action is sustainable in his own name.

Again, an action generally cannot be supported on a contract, not under seal, without the plaintiff alleges in pleading and proves on trial, in the first instance, that the contract was made for a sufficient consideration. But, in case of bills of exchange and promissory notes, a sufficient consideration is presumed, and the validity of the paper cannot be disputed on account of a want of sufficient consideration, when it is in the hands of a *bona fide* holder, who has given value for it.

Suits upon bonds, and most other choses in action, must be in the name of the original obligee, and, though it is apparent that he sues merely as trustee for another, to whom he has assigned his interest, yet, a release from him, or set-off due from him to the obligor, may be an effectual bar, unless the release or set-off is subsequent to the assignment. Chitty on Bills, 6.

It has been already remarked, that an essential element in negotiable paper, so that an action can be sustained in the name of any holder is, that the paper shall be paid absolutely in money, according to its terms, and cannot be subject to any contingency. Though the coupons in question are payable in money, yet being separate from the scrip, to which they were originally attached, they do not contain enough to enable a holder certainly to recover in his own name, beyond a contingency.

The manifest reason for the necessity that negotiable instruments should possess these properties is, that it should have currency as independent paper. *Myers* v. *Y. & C. R. R. Co.*, 43 Maine, 232. If the payment is to be made upon an event which is not absolutely certain to take place, the paper is not negotiable, however remote the probability that it will not occur.

In the case of *Carlos* v. *Fancourt*, 5 Term R., 483, which was an action upon an instrument, payable on an event which was contingent, Lord KENYON says, — "The question in this case is not whether the plaintiff in error, who may have promised, for a valuable consideration, to pay the defendant a certain sum of money on an event, which has since happened, is or is not bound to perform that promise? If this promise was made on a consideration, there is no doubt but that an action might be maintained upon it as a special agreement. But the question now before the Court is, whether or not the note set forth in the record can be declared on as a negotiable security under the statute of 3 and 4 of Anne, c. 9. The object of that statute was to put promissory notes on the same footing with bills of exchange, in every respect. It would perplex the commercial transactions of mankind, if paper securities of this kind were issued out into the world encumbered with conditions and contingencies; and if the persons, to whom they are offered in negotiation, were obliged to inquire when the uncertain events would probably be reduced to a certainty." — "The justice of the case is certainly with the defendant in error, but we must not transgress the legal limits of law, in order to decide according to conscience and equity." In the same case, ASHHURST, J., says, — "Before the statute of Anne, promissory notes were not assignable as *choses in action*, nor could actions have been brought on them, because the considerations do not appear on them; and it was to answer the purpose of commerce, that those notes were put by the statute on the same footing with bills of exchange. Then they cannot rest on a better footing than bills of exchange, but must stand or fall, on the same rules by which bills of exchange

are governed. Certainty is a great object in commercial instruments, and, unless they carry their own validity on the face of them, they are not negotiable."

The language of the statute of Anne is, "therefore, to the intent to encourage trade and commerce, which will be much advanced, if such notes shall have the same effect as inland bills of exchange, and shall be negotiable in like manner," &c.

Judge STORY, in his work on bills of exchange, in § 60, says, — "The general rule is, that a bill of exchange always implies a personal general credit, not limited, or applicable to particular circumstances and events, which cannot be known to the holder of the bill in the general course of its negotiation, and, if the bill wants, upon the face of it, this general essential quality of character, the defect is fatal."

That the scrip of the defendants is negotiable is not denied. But the coupons have been separated therefrom, and passed by delivery, to those who are strangers to the scrip; and it was not expected or designed, that the holder of the former should ever possess the latter, which, being negotiable, will be scattered far and wide, with no means of tracing its progress. If of par value, it will pass from hand to hand, as current cash bills.

The coupons in suit, it is not suggested, are in terms payable on a contingency, but they have on their face nothing which makes them negotiable, and, whether they can be shown to be so, by inspection of the scrip from which they were taken, must depend upon a very remote contingency.

A person in commercial pursuits receives negotiable paper, because he is satisfied that the parties to whom he could look for payment are responsible, and because he knows, if the paper shall be protested, the paper itself and the protest is all he needs to recover the amount in a suit in his own name.

It is true, that the public are so informed of the terms of the scrip, that its negotiability is unquestioned, and, so long

as the corresponding coupons are promptly paid, they would be taken as would notes, not negotiable, against persons of known ability to pay. But, in a suit upon a coupon like those before us, in the name of the holder, who had not the piece of scrip from which it was taken, if it should be defended, on the ground that it was not negotiable, the proof that the paper from which it was taken was so, must be from the inspection of the paper itself, and the difficulty presented therein must ordinarily be absolutely insurmountable. The paper, to be negotiable, must be so upon its own face, without reference to any other.

2. It is insisted, that the paper in question has the character of negotiability, by custom. It is not, however, claimed that this custom is such that it has become a part of the law merchant to be pronounced by the courts. But it is attempted to be shown, like local customs, which, if established, are supposed to be referred to when certain species of contracts are made, and are treated as elements in their interpretation. The custom attempted to be shown in testimony does not appear to us to be of that character. The whole amount of the evidence on this point is, that coupons, separate from the scrip to which they were originally attached, have passed from hand to hand with very little regard to their form, and without consideration whether they contained negotiable words or not. They have been received in various transactions, because they had been promptly paid, and were expected to be so paid in future, without suit in the name of any one. A negotiable character cannot with so much reason be claimed for them as was claimed for goldsmiths' and other promissory notes, in the time of Lord HOLT, which has been referred to. We have seen that the promissory notes of that time were generally esteemed by merchants as negotiable, they being so in form; but their negotiability was strenuously opposed by the courts, till the enactment of. the law in the 3 and 4 of Anne, c. 9. Promissory notes never were legally negotiable in England, till they were made so by Act of Parliament.

But from the evidence introduced of custom, the great test of practical negotiability of coupons was wanting, that is, there was nothing to show that the holder of a coupon, like those in suit, has ever attempted to sustain an action in his own name thereon, when he was not also the holder of the scrip to which it corresponded, much less that any such suit has been maintained when its negotiability has been controverted. If the mere passage of coupons from one to another, as the representative of money, would give to them this character, other species of paper, for a like reason, might become so, when such a result would not be thought of by any one. It is not easy to perceive, in what manner the evidence introduced on this point can bear upon the case, in any mode whatever; and the evidence itself was not sufficient to require the Court to put the question of negotiability to the jury.

3. The third ground on which it is contended that the action can be maintained, is by the authority of the statutes which have been referred to. It is contended in defence, that the statute of 1856 was repealed by what has generally been denominated the Repealing Act, in the revision of 1857, and that the saving clause in § 2 of that Act, cannot be invoked in this case. We cannot doubt that the saving clause referred to would embrace this case, as all the coupons now in suit were possessed by the plaintiffs, who had paid a valuable consideration therefor.

Assuming, then, that these coupons are outstanding and available security against the city of Augusta, which is a matter of fact not yet settled, at the time of the passage of the statutes referred to, which then became the law of the State, by the terms thereof these coupons were embraced, and were made subject to their provisions. This is not denied in the defence, but it is insisted that, as this was after the scrip and the coupons were issued, the statute impaired the obligation of those contracts. By the scrip, the promise is to the holder, without the name of any payee expressed. The coupons are promises to pay, generally, no

name being expressly mentioned, and not to holder or bearer. The former contemplates the payment of the sum named therein, on presentment thereof, at the end of twenty years from date. The latter are referred to in the former, and to be paid as they severally become due; and contain an express promise to pay. The payment is not to be made on presentment of the scrip, but it is manifest that it is to be on the presentment of the coupons alone. It is therefore quite evident that it was the intention that the coupons would be detached from the scrip, and disposed of as occasion might demand, or would be presented by the holder of the scrip for payment, without the scrip itself. This is in accordance with the evidence introduced on both sides, and no controversy exists as to the fact. The intention of the city to pay some one is clear, otherwise the instrument is simply absurd. The payment was to be made to the holder of the scrip and the coupons, if the latter had not been assigned. No impediment existed to the recovery of the coupons, in the name of the holder of the scrip, whoever the latter might be. The transfer of the coupons without the scrip being in contemplation of the city, as we have seen, was somewhat similar to the assignment of a chose in action, not negotiable. This provision in no sense affected the substantial rights of the city. It provided for the institution of and the recovery in a suit, in the name of the holder of the coupon for a valuable consideration, thus providing that the owner should recover upon the promise actually made when the scrip is issued. The case is distinguishable from that of *Jackson* v. *Y. & C. R. R. Co.*, 48 Maine, 147, where the statute invoked in its support was passed pending the action, and the contract was a specialty, and the coupons were not payable to any one, or to bearer.

It is said, that the statute is in violation of the constitution, because it makes the coupons negotiable. The doctrine relating to the negotiability of promissory notes, under the statute of 3 and 4 of Anne, c. 9, is, that if they are negotiable, an action may be sustained in the name of the

indorsee, so that this right and negotiability are convertible terms.   The statute of this State does not in terms provide that coupons detached from the scrip shall be negotiable, but that the assignee, having paid a valuable consideration for the assignment, may maintain assumpsit on the instrument in his own name, thus allowing the real owner of the paper to recover thereon, instead of the one whose interest has ceased.   The suits are not, by the statute provision, increased in number or expense, but allow the holder, who has paid a valuable consideration for the paper, to recover thereon against the party who made the promise originally, with the expectation that it would be presented for payment, if there should be occasion, separate from the scrip, by one having no interest in the latter.

The statute evidently looks to the remedy alone, and does not impair the obligation of contracts existing in these instruments.   Actions, in the name of the holder, under the provision, are quite analogous to the action which allows one to maintain the equitable suit, for money had and received by the defendant for the plaintiff's use, on the ground that the former has in his hands money which belongs to the latter, without any express promise to pay it to him.

But it is contended, in behalf of the city, that these statutes are inapplicable to this case, because they refer to coupons for the interest of *bonds* issued, &c., or where coupons for interest are issued with *bonds*, &c., and R. S. of 1841, c. 1 § 3, clause 1, are invoked in support of the position, and also c. 1, § 4, clause 1, in the revision of 1857, which is substantially the same.   The rule is as follows,—" All words and phrases shall be construed according to the common and approved meaning of our language ; but technical words and phrases, and such others as have acquired a peculiar and appropriate meaning in law, shall be construed and understood according to that peculiar meaning."

We think the construction contended for is too restricted to accord with the intention of the Legislature.   The term bond has a great variety of significations, and in law it does

not necessarily import a seal, as the word is ordinarily used. Webster defines it to be an obligation, or deed, by which a man binds himself, his heirs, &c. The definition of the word "technical," which is, "pertaining to art or the arts," will not generally apply to the word bond. The same lexicographer adds to the foregoing meaning of the word, "a technical word is a word that belongs properly or exclusively to an art."

When the whole of § 1 of c. 248 of the statutes of 1856 is examined together, and § 34 of c. 51 of R. S. is read in connection with the next preceding section, it is very manifest that the construction insisted on cannot be adopted. It could not have been the design of the Legislature, in these provisions, to exclude every contract from their operation which had not upon it a seal. It is difficult to conceive of any reason for such an exclusion. And we think the plain meaning of the Legislature forbids it.

The conclusion is, that the third ground taken by the plaintiffs in support of the action is sustainable, provided the city was ever liable upon the scrip, and the coupons in question are now outstanding uncancelled evidence of indebtedness of the city in the hands of the plaintiffs.

*Nonsuit taken off, and the action to stand for trial.*

CUTTING, MAY and DAVIS, JJ. concurred.
GOODENOW, J., concurred in the result.